**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| NATIONWIDE MUTUAL INSURANCE COMPANY, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| GERALD GARZONE, et al., | : | No. 07-4767 |

_____

| | | |
|---|---|---|
| NATIONWIDE MUTUAL INSURANCE | : | |
| COMPANY., et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | No. 08-3895 |
| GERALD GARZONE, et al. | : | |

**MEMORANDUM RE: MOTIONS FOR SUMMARY JUDGMENT**

**Baylson, J.**                                                         **September 17, 2009**

There are several outstanding motions in two related insurance coverage dispute cases

that are currently before this Court.  In the first case, Civil Action No. 07-4767, Nationwide

Mutual Insurance Company ("Nationwide") initiated a declaratory judgment action against

Defendants Gerald Garzone, Louis Garzone, James McCafferty, Jr., Liberty Cremation, Inc.

("Liberty") (collectively,"Liberty Defendants"), and Defendants Jan Schaming, as guardian of the

person of Harry W. Malloch, III, an incapacitated person, Jan Schaming, David Schaming,

Daniel Oprea, and Mary Rose Oprea (collectively, "07-4767 Underlying Plaintiffs").

In the second, Civil Action No. 08-3895, Nationwide initiated a declaratory judgment

action against the Liberty Defendants, Margaret McCafferty d/b/a James A. McCafferty Funeral

Home, and several other sets of underlying plaintiffs ("08-3895 Underlying Plaintiffs").[1]  In both

_____

[1] The 08-3895 Underlying Plaintiffs are: (a) Martha Wilson, Nancy Wilson, James
Wilson, and Neil Pancoast; (b) William Carter and Kay Carter; (c) Veronica Jenkins and Wayne

cases, Nationwide seeks to have this Court render a judgment on the extent of its duty to defend

and/or duty to indemnify the Liberty Defendants and Margaret McCafferty in several cases

instituted by the Underlying Plaintiffs that are ongoing in the Court of Common Pleas of

Philadelphia County, in New York state court, and cases consolidated in the U.S. District Court

for the District of New Jersey.  The primary motions before this Court are Nationwide's Motions

for Summary Judgment, filed in both cases.

## I.      Background and Procedural History

During the period of time at issue, Defendants Gerald Garzone, Louis Garzone, and

James McCafferty, Jr. were joint owners and officers of Liberty Cremation, Inc.  (07-4767, 08-

3895 Statement of Undisputed Facts ¶¶ 4, 5).  Liberty held itself out to the public as a provider of

crematory services with a principal place of business at 2778 Ruth Street in Philadelphia,

Pennsylvania.  (07-4767, 08-3895 Statement of Undisputed Facts ¶ 2).  On October 17, 2004,

Nationwide started providing insurance coverage to Liberty under a commercial general liability

insurance policy, which was renewed for one-year periods until October 17, 2007.  (07-4767, 08-

3895 Statement of Undisputed Facts ¶ 1).  Nationwide provided insurance coverage to James

---

Jenkins; (d) Marie Bowers; (e) James Finnegan; (f) Ralph Angellilli; (g) Albert Long; (h) Ryan
Walsh; (i) Siarra Michelle Upchurch; (j) Nancy Gibson; (k) Ernest Stuard, Mary Ann Stuard,
Barbara O'Connor, Mary Morris, and Charles Morris; (l) Denise Holzer, Justin Saranczak,
Brandon Saranczak, and Kenneth Saranczak; (m) Charlene Williams; (n) Stephenie Maggio; (o)
Edward Walters, Walter W. Mottershead, Jr., Mary Mottershead, Elizabeth Mottershead, Eileen
Walters, Adeline Gosner, and Richard Gosner; (p) Kathleen Laberta, Anthony Laberta, Barbara
McFadden, and Donald McFadden; and (q) Robert Samanns and Stephanie Samanns.  Though
initially the parties had not provided the underlying complaints in the Jenkins, Angellilli, and
Maggio matters, both Nationwide and counsel for the Underlying Plaintiffs have since provided
the Court with the Jenkins and Maggio complaints in a letter to the Court dated August 26, 2009
and August 27, 2009, respectively, and the Angellilli complaint was filed in a supplemental brief
dated September 11, 2009.  (Doc. 116 Ex. A).

McCafferty, Sr. d/b/a James A. McCafferty Funeral Home on April 21, 2005 for two one-year periods.  (08-3895 Pl.'s Mot. Summ. J. at 10).  The policy was renewed annually by Margaret McCafferty starting April 21, 2007.  (Id.).

According to Nationwide, at some point prior to the alleged conduct that is the subject of the underlying lawsuits, Liberty made a complaint to Nationwide that the policy it was issued was not the one that it had ordered.  (07-4767 Statement of Undisputed Facts ¶¶ 11-12; 08-3895 Statement of Undisputed Facts ¶ 8; Pl.'s Mot. Summ. J. at 7-8).  The initial policy contained an exclusion for "Funeral Services."  (Id.).  Liberty complained to Nationwide that this exclusion was improperly included in the policy and that their policy should instead include the Morticians' Professional Liability Coverage endorsement.  (Id.).  In response, Nationwide voluntarily reformed the policy to include the Morticians' endorsement.  (Id.; Pl.'s Mot. Summ. J. Ex. F).

A.      **Allegations of the Underlying Complaints**

While Liberty was publicly presenting itself as a crematorium, the underlying complaints[2] (and many others that are not currently the subject of these lawsuits) allege that the Liberty Defendants were involved, either intentionally or by their negligence, in a scheme to harvest the organs of deceased individuals, whose bodies were entrusted to the care of Liberty, the Garzone

---

[2] As will be discussed below, this Court must only consider those factual allegations that are in the complaints of the underlying cases in determining whether the insurer's duty to defend is triggered.  As such, all citations for the factual allegations will be made to the underlying complaints.

Though not pertinent to the Court's analysis, it is relevant to note that the individual Liberty Defendants have pled guilty to several criminal charges in state court and are currently incarcerated as a result of their involvement in the alleged scheme.

Funeral Home, or the James McCafferty Funeral Home for burial or cremation,[3] without the consent of the deceased or their families.  The underlying complaints allege that the Liberty Defendants and the McCafferty Funeral Home gave an organization, Biomedical Tissue Services ("BTS"), and its employees, access to the bodies entrusted to the care of the Liberty Defendants and the McCafferty Funeral Home for burial or cremation.  Once they were permitted access to the bodies, BTS and its employees allegedly harvested body organs without the consent of the deceased or the deceased's family members and sold the organs by falsifying consent forms, the deceased's medical documentation, and documents for the deceased's identification.  The Underlying Plaintiffs also allege that the Liberty Defendants either facilitated or ignored the falsification of medical documentation by the BTS agents, which permitted BTS to sell the body organs by, for example, misrepresenting the age of the deceased or failing to disclose that the deceased had been infected with hepatitis C.

The underlying complaints typically contain the following counts, usually with this numbering, against the Liberty Defendants and the McCafferty Funeral Home:  (1) civil conspiracy; (3) negligence; (6) negligent infliction of emotional distress; (7) breach of fiduciary duty; (8) fraud/deception under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"); (9) misrepresentation of product benefits under the UTPCPL; (10) misrepresentation of product quality under the UTPCPL; (11) false advertising under the UTPCPL; (12) negligent misrepresentation; (13) intentional misrepresentation; (14) deceit; and

---

[3] It appears from the briefing and from the discussion at oral argument that James McCafferty, Jr., one of the individuals involved in providing access to the bodies, was an employee or agent of the James McCafferty Funeral Home at the time.  As noted above, he was also a co-owner of Liberty Cremation.

(17) loss of consortium, in some of the cases.  For purposes of the Court's analysis, additional detail for some of these counts is necessary.

Count 3 of the underlying complaints, the negligence claim, alleges that the Liberty Defendants and the McCafferty Funeral Home were professionally negligent in the care, preparation, and disposal of the decedents.  (Schaming Compl. ¶¶ 60-63; Oprea Compl. ¶¶ 58-61).[4]  In particular, the underlying plaintiffs allege that the Liberty Defendants and the McCafferty Funeral Home failed to obtain and/or verify consent before allowing decedent's tissue to be harvested (Schaming Compl. ¶¶ 63(a)-(c); Oprea Compl. ¶¶ 61(a)-(c)), improperly prepared, provided, and relied upon inaccurate documentation (Schaming Compl. ¶¶ 63(d)-(h), (k); Oprea Compl. ¶¶ 61(d)-(h), (k)), entrusted the decedents to BTS for tissue harvesting, or failed to prevent BTS from harvesting tissue when the Liberty Defendants and the McCafferty Funeral Home knew the decedents were not candidates for tissue harvesting (Schaming Compl. ¶¶ 63(i)-(j); Oprea Compl. ¶¶ 61(i)-(h)), and concealed these activities (Schaming Compl. ¶ 63(l); Oprea Compl. ¶ 61(l)).

Count 6 of the underlying complaints, the negligent infliction of emotional distress claim, alleges that the conduct of the Liberty Defendants and the McCafferty Funeral Home caused the Underlying Plaintiffs severe emotional distress and anguish.  (Schaming Compl. ¶ 85; Oprea Compl. ¶ 83).

---

[4] The Schaming and Oprea complaints, which are the subject of the 07-4767 action, are generally representative of all of the underlying complaints at issue in this case in regards to the pleadings and allegations.  Unless there is a significant difference among the underlying complaints, citations will be limited to the Schaming and Oprea complaints.

Count 7 of the underlying complaints, the breach of fiduciary duty claim, alleges that the Liberty Defendants and the McCafferty Funeral Home created a fiduciary relationship with the Underlying Plaintiffs when they contracted to cremate the decedent's remains.  (Schaming Compl. ¶¶ 91-92; Oprea Compl. ¶¶ 90-91).  The Liberty Defendants and the McCafferty Funeral Home allegedly breached these fiduciary duties by concealing material facts concerning the organ harvesting and by permitting BTS's organ harvesting.  (Schaming Compl. ¶¶ 93-94; Oprea Compl. ¶¶ 91-92).  The complaints also allege that the Liberty Defendants and the McCafferty Funeral Home were negligent in breaching the fiduciary duty, though they do not identify what acts were negligent, as opposed to intentional.  (Schaming Compl. ¶ 96; Oprea Compl. ¶ 94).

Count 12 of the underlying complaints, the negligent misrepresentation claim, generally alleges that the Underlying Plaintiffs justifiably relied on the Liberty Defendants' and the McCafferty Funeral Home's representations of their service in selecting them to handle their decedent's remains.  (Schaming Compl. ¶ 130; Oprea Compl. ¶ 128).  Specifically, the Underlying Plaintiffs allege that the Liberty Defendants and the McCafferty Funeral Home negligently misrepresented that:  the casket would not be opened (Schaming Compl. ¶ 131; Oprea Compl. ¶ 129), the decedent would be cremated without any organ harvesting (Schaming Compl. ¶ 132; Oprea Compl. ¶ 130), and the Underlying Plaintiffs' directives would be honored in the decedent's disposition (Schaming Compl. ¶ 133; Oprea Compl. ¶ 131).  They also allege that the Liberty Defendants and the McCafferty Funeral Home knew or should have known that the decedent's tissue and organs would be harvested while in their care.  (Schaming Compl. ¶ 134; Oprea Compl. ¶ 132).  Alternatively, the Underlying Plaintiffs allege that the

misrepresentations were reckless or intentional.  (Schaming Compl. ¶¶ 134, 135; Oprea Compl. ¶¶ 132, 133).

**B.     Schaming Complaint**

As for the first set of 07-4767 Underlying Plaintiffs, the Schaming Plaintiffs (Malloch, Jan Schaming, and David Schaming) brought suit against the Liberty Defendants and others in the Pennsylvania Court of Common Pleas of Philadelphia County.  (Schaming Compl.).[5]  The Schaming Plaintiffs allege that the body of Eleanor Jan Malloch, who was the deceased mother of Jan Schaming and Henry Malloch, III, was entrusted to the care of Liberty for purposes of cremation.  (Schaming Compl. ¶ 18).  At the time, neither the deceased nor any of her family members ever notified Liberty that it was permitted to harvest her organs for transplant or other purposes.  (Schaming Compl. ¶ 20).  Despite the lack of consent, the Schaming Plaintiffs allege that the Liberty Defendants, either intentionally or negligently, permitted BTS to harvest the organs of the deceased and, either intentionally or negligently, permitted or facilitated the other defendants in forging, falsifying, or altering the documentation of death and consent for organ harvesting.

**C.     Oprea Complaint**

The Oprea Plaintiffs (Daniel Oprea and Mary Rose Oprea) brought an almost identical lawsuit against the Liberty Defendants and others in the Pennsylvania Court of Common Pleas of

---

[5] The applicable version of the complaints for both the Schaming lawsuit and the Oprea lawsuit is the Third Amended Complaint.  The Third Amended Complaint for the Schaming lawsuit is attached to Nationwide's 07-4767 Second Amended Complaint as Exhibit A.  (Doc. 44).  Citations to that exhibit will be to (Schaming Compl.).  The Third Amended Complaint for the Oprea lawsuit is attached as Exhibit B to Nationwide's 07-4767 Second Amended Complaint.  Citations to that exhibit will be to (Oprea Compl.).

Philadelphia County. (Oprea Compl.). In that lawsuit, the Oprea Plaintiffs allege that the body

of Rose M. Oprea, the deceased mother of Daniel Oprea, was entrusted to the care of Liberty for

cremation. (Oprea Compl. ¶ 16). Similar to the Schaming action, the complaint alleges that

neither Rose Oprea nor any of her family members ever consented to donating her organs upon

her death. (Oprea Compl. ¶ 18). Despite the lack of consent, the Oprea Plaintiffs similarly allege

that the Liberty Defendants, either intentionally or negligently, permitted BTS to harvest the

organs of the deceased and, either intentionally or negligently, permitted or facilitated the other

defendants in forging, falsifying, or altering the documentation of death and consent for organ

harvesting.

### D. Procedural History

In response to the underlying lawsuits, Nationwide is currently providing a defense to the

Liberty Defendants and Margaret McCafferty under a reservation of rights. (07-4767 Statement

of Undisputed Facts ¶ 9; 08-3895 Statement of Undisputed Facts ¶ 7). However, seeking a

determination on whether it is legally obligated to continue defending and/or indemnify the

Liberty Defendants and the McCafferty Funeral Home, Nationwide brought the declaratory

judgment action in 07-4767 against both the Liberty Defendants and the 07-4767 Underlying

Plaintiffs on November 13, 2007. (07-4767, Doc. 1). Nationwide brought the second declaratory

judgment action in 08-3895 against the Liberty Defendants, Margaret McCafferty, and the 08-

3895 Underlying Plaintiffs on August 15, 2008. (08-3895, Doc. 1). In both of these actions,

Nationwide contends that the terms of the insurance policy issued to Liberty, including the

Morticians' endorsement, and the terms of the policy issued to Margaret McCafferty d/b/a James

A. McCafferty Funeral Home do not require Nationwide to defend or indemnify the Liberty

Defendants or Margaret McCafferty for any of the claims brought by the Underlying Plaintiffs in the underlying lawsuits.

While the Underlying Plaintiffs answered the original complaint in both cases, Louis Garzone, James McCafferty, and Liberty Cremation did not respond in both cases, and Gerald Garzone failed to respond in 08-3895.  Default judgment was entered against each of the those absent parties.  (07-4767, Doc. 31; 08-3895, Doc. 49).

Nationwide then filed a Motion for Summary Judgment in 07-4767 on May 27, 2008.  (07-4767, Doc. 30).  In the 08-3895 action, Margaret McCafferty filed a Motion to Dismiss on November 7, 2008.  (08-3895, Doc. 34).

This Court held oral argument on Nationwide's Motion for Summary Judgment on December 1, 2008.  (07-4767, Doc. 42).  During that argument, the Court raised concerns about the underlying complaints in the Schaming and Oprea lawsuits.  In particular, the argument focused on certain pleading issues in the underlying complaints that the Court viewed as problems for the 07-4767 Underlying Plaintiffs' legal arguments.  The 07-4767 Underlying Plaintiffs agreed to amend their underlying complaints.  The Court therefore denied Nationwide's Motion for Summary Judgment without prejudice pending those amendments on December 4, 2008.  (07-4767, Doc. 41).

On December 23, 2008, the Court held oral argument on Margaret McCafferty's Motion to Dismiss.  (08-3895, Doc. 61).  During the argument, the same issues in the underlying complaints were raised, and the parties again agreed to amend the underlying complaints.  In anticipation of these changes, Margaret McCafferty's Motion to Dismiss was denied without prejudice.  (08-3895, Doc. 59).

After the Underlying Plaintiffs amended the underlying complaints, Nationwide filed a Second Amended Complaint[6] on February 12, 2009 in both cases.  (07-4767, Doc. 44; 08-3895, Doc. 63).  The Underlying Plaintiffs and Margaret McCafferty answered the complaints and filed counterclaims against Nationwide, seeking their own declaratory judgment regarding the insurance coverage.  (07-4767, Doc. 45) (07-4767 Underlying Plaintiffs); (08-3895, Doc. 64) (08-3895 Underlying Plaintiffs); (08-3895, Doc. 65) (Margaret McCafferty); (08-3895, Doc. 67) (Nancy Gibson, one of the 08-3895 Underlying Plaintiffs, answered the complaint without filing a counterclaim).  After answering each of the counterclaims, Nationwide filed the current Motion for Summary Judgment in both actions.  (07-4767, Doc. 47; 08-3895, Doc. 68).  Each party remaining in the case responded to the motion.  (07-4767, Doc. 51, 52; 08-3895, Doc. 75, 84, 86, 87).

In addition, Margaret McCafferty filed two motions that are also before the Court:  a Motion to Sever (08-3895, Doc. 76) and a Motion to Stay the Proceedings Pending Additional Discovery (08-3895, Doc. 77).  Nationwide filed a response in opposition to each.  (08-3895, Doc. 83, 85).

On June 15, 2009, non-parties, Regeneration Technologies, Inc. and Tutogen Medical, Inc. filed a Motion to Intervene and for a Protective Order pursuant to Rules 24 and 25 of the Federal Rules of Civil Procedure.  (08-3895, Doc. 88).  The Motion focuses on a subpoena that Nationwide served on the District Attorney of Philadelphia concerning the criminal investigation

---

[6] Despite the name, it appears from the pleadings that this is Nationwide's First Amended Complaint in the 07-4767 action.

of the alleged activities of the Liberty Defendants.  Nationwide responded in opposition to the Motion on July 2, 2009.  (08-3895, Doc. 92).[7]

On July 20, 2009, Nationwide sent a letter, which was placed on the record, notifying the Court of recent developments in the underlying litigation of the <u>Samanns</u> and <u>Laberta</u> matters. (07-4767, Doc. 53; 08-3895, Doc. 93).  Margaret McCafferty responded to Nationwide's letter on August 5, 2009.  (08-3895, Doc. 96).  On August 7, 2009, counsel for the Underlying Plaintiffs in both actions responded to Nationwide's letter.  (07-4767, Doc. 54; 08-3895, Doc. 94).

The Court held oral argument on all of the outstanding motions on August 28, 2009.  (07-4767, Doc. 56; 08-3895, Doc. 102).  During the oral argument, several issues arose that required supplemental briefing.  The parties submitted the first round of supplemental briefing on September 4, 2009.  Nationwide first provided two affidavits attesting to the policies applicable to the James A. McCafferty Funeral Home.  (08-3895, Doc. 104, 105).  Nationwide then filed parallel supplemental briefs on the issues raised at oral argument concerning the Liberty Defendants in both civil actions, (07-4767, Doc. 58; 08-3895, Doc. 108), and the Underlying Plaintiffs filed their own supplemental brief on the same day, (07-4767, Doc. 60; 08-3895, Doc. 111).  In addition, Nationwide filed a supplemental brief concerning issues raised that were particularly related to Margaret McCafferty d/b/a James A. McCafferty Funeral Home.  (08-3895, Doc. 109).  Margaret McCafferty responded with her own supplemental brief on September 10, 2009.  (08-3895, Doc. 112).

---

[7] The Motion to Intervene and for a Protective Order will be considered in a separate memorandum and order.

**II.     Terms of the Insurance Policies**

**A.     Liberty Policy**

**1.     Commercial General Liability Coverage Form**

As discussed above, Nationwide provided insurance coverage to Liberty Cremation, Inc.

under Policy No. 58 PR 184634-3001.  (07-4767 Statement of Undisputed Facts ¶ 1).  The more

traditional portion of the policy at issue is the Commercial General Liability ("CGL") Coverage

Form.[8]  Under that portion of the policy, Nationwide agrees to:

> pay those sums that the insured becomes legally obligated to pay as
> damages because of "bodily injury" or "property damage" to which
> this insurance applies.  We will have the right and duty to defend
> the insured against any "suit" seeking those damages.  However,
> we will have no duty to defend the insured against any "suit"
> seeking damages for "bodily injury" or "property damage" to
> which this insurance does not apply.

(CGL at 1).  The insurance is deemed to apply "to 'bodily injury' and 'property damage' only if

(1) The 'bodily injury' or 'property damage' is caused by an 'occurrence' . . . ."  (Id.).  The CGL

then provides the following definitions.

> "Bodily injury" means bodily injury, sickness or disease
> sustained by a person, including death resulting from any of these
> at any time. . . .
>      "Occurrence" means an accident . . . .
>      "Property damage" means:  (a.)  Physical injury to tangible
> property . . . .

(CGL at 11, 13, 14).

---

[8] The policy is attached to Plaintiff's Motions for Summary Judgment as Exhibit D.  The
pages within the policy, however, are not numbered.  The CGL portion of the policy, located in
the latter half of Exhibit D, does contain its own numbering.  All citations to the CGL will be
made as, for example, (CGL at 1).

The CGL Policy also provides several other relevant conditions.  First, the Policy creates an exclusion for expected or intended harms:  "This insurance does not apply to:  (a.) 'Bodily injury' or 'property damage' expected or intended from the standpoint of the insured."  (CGL at 2).  The CGL Policy also contains an exclusion for particular types of property damage:  "This insurance does not apply to . . . (j.)  'Property damage' to . . . (4) Personal property in the care, custody or control of the insured."  (CGL at 4).

In defining who is "an insured," the CGL Policy provides that:

> 1. If you are designated in the Declarations as: . . . .
> d. An organization other than a partnership, joint venture or limited liability company, you are an insured.  Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. . . .
> 2. Each of the following is also an insured:
> a. Your . . . "employees," other than . . . your "executive officers" . . . , but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for: . . .
> (2) "Property damage" to property . . .
> (b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by you, any of your "employees," [or] "volunteer workers" . . . .

(CGL at 8).

Finally, the original policy issued to Liberty also contained an exclusion for "Funeral Services."  The Funeral Services exclusion stated that "[t]his insurance does not apply to 'bodily injury,' 'property damage' or 'personal and advertising injury' arising out of errors or omissions in the handling, embalming, disposal, burial, cremation or disinterment of dead bodies."  (Pl.'s Mot. Summ. J. Ex. D-2 at 39).

### 2.      Morticians' Professional Liability Coverage Endorsement

Liberty was also covered by the Morticians' Professional Liability Coverage endorsement, which was an amendment to the terms of the CGL.  (Pl.'s Mot. Summ. J. Ex. E).  Several of the provisions in the Morticians' endorsement are relevant.  First, the Declarations of the coverage required the insured to "not use the premises for any undisclosed purposes, and [to] not conduct any business operations at any undisclosed locations."  (Pl.'s Mot. Summ. J. Ex. E at 1).  Where the terms of the Declarations are satisfied:

> We will pay those sums that the insured becomes legally obligated to pay as damages arising out of an occurrence caused by:
> 1.  bodily injury including mental anguish,
> 2.  property damage to urns, caskets, linings or fittings, casket cases, crypts, mausoleums or other facilities for the care or burial of a deceased human body, belonging to others and in the care, custody or control of the insured, for the purpose of buying [sic] or caring for a deceased human body; or
> 3.  property damage to property of others which is not in the care, custody or control of the insured,
> due to any professional malpractice or mistake in the embalming, disposition, burial, disinterment or removal of any deceased human body or any conduct of any memorial service by the insured even though no deceased human body actually be present, or because of any injury to, destruction of or interference with the right of burial of a deceased human body.

(Id.).

However, as with the other parts of the policy, the Morticians' endorsement also contains an exclusion.

> This insurance does not apply:
> 1.  To bodily injury or property damage arising out of the willful violation of a penal statute or ordinance committed by or with knowledge or consent of any insured; but this exclusion does not apply to any act done in good faith at the request of a public official having apparent authority to require or permit such act.

(Pl.'s Mot. Summ. J. Ex. E at 2).  A "deceased human body" is defined as including "any part of a human body severed therefrom and also ashes of a deceased human body after legal cremation."  (Id.).  The coverage also notes that "[t]his insurance shall apply only as excess insurance over any other valid and collectible insurance which would apply in the absence of this coverage, except insurance written specifically to cover excess over the Limits of insurance to this endorsement." (Pl.'s Mot. Summ. J. Ex. E at 3).  Finally, the form states: "All other provisions applicable to the coverage part or policy attached, not in conflict with the provisions of this endorsement, shall apply."  (Id.).

### B.      McCafferty Funeral Home Policy Terms

The policies that covered the McCafferty Funeral Home are, for the most part, identical to the Liberty policies.  The specific terms of the McCafferty Funeral Home policies, and the analysis of those policies, will be provided in more detail in the section specifically discussing the duty to defend for the McCafferty Funeral Home.

## III.    Jurisdiction and Legal Standard

### A.      Jurisdiction

Nationwide instituted this action seeking a declaratory judgment under the Federal Declaratory Judgment Act, codified at 28 U.S.C. § 2201.  This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) since the parties are diverse and the amount in dispute exceeds $75,000.

### B.      Choice of Law

When a federal district court presides over a case grounded in diversity jurisdiction, the court must apply the choice-of-law rules of its forum state.  Klaxon v. Stentor Elec. Mfg., 313

U.S. 487, 496 (1941); LeJeune v. Bliss-Salem, Inc., 85 F.3d 1069, 1071 (3d Cir. 1996).  As there is no dispute between the parties concerning which law applies here, this Court will apply Pennsylvania law.

      **C.**     **Summary Judgment Standard**

      Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

      A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."  Id. at 325.  After the moving party has met its initial burden, the adverse party's response must, "by affidavits or as otherwise provided in this rule [] set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477

U.S. at 322.  Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party.  <u>Anderson</u>, 477 U.S. at 255.

## IV.      Motions for Summary Judgment as to Liberty

### A.      Party Contentions

#### 1.      Contentions in the Briefs

Nationwide and the Underlying Plaintiffs base the majority of their contentions on general insurance policy interpretation principles and several basic cases.  Nationwide ultimately argues that it is not obligated to defend or indemnify the Liberty Defendants and Margaret McCafferty in the underlying lawsuits for several reasons.  First, Nationwide contends that the conduct alleged in the underlying complaints consists entirely of intentional or knowing acts, which places the underlying complaints outside of the scope of the insurance policies, and that there are no genuine factual allegations of negligence to support the legal claims.  Nationwide argues that the Underlying Plaintiffs also essentially conceded the intentionality of the Liberty Defendants when they answered Nationwide's Second Amended Complaint.  Second, as to the type of harm that is alleged, Nationwide asserts that the sole harms alleged by the plaintiffs, emotional distress and financial/pecuniary loss, do not constitute "property damage" or "bodily injury."  Third, as for the Morticians' endorsement, Nationwide contends that the harms alleged were not caused by the negligent exercise of professional skills, nor was the conduct within the scope of the Liberty Defendants' employment.  Fourth, Nationwide asserts that the Liberty Defendants violated the Declarations section of the Morticians' endorsement by engaging in "undisclosed business operations."  Fifth, Nationwide argues that the non-negligence claims (i.e. the claims for conspiracy, breach of fiduciary duty, fraud, consumer fraud, misrepresentation, and

deceit) are indisputably not covered.  Finally, Nationwide argues that public policy should prohibit a duty to defend/indemnify due to the illegality of the alleged acts.

In response, the Underlying Plaintiffs make several arguments which they contend establish Nationwide's duty to defend under the terms of the policies.  First, the Underlying Plaintiffs argue that the underlying complaints contain many legitimate factual allegations of negligence on the part of the Liberty Defendants in their counts for negligence, negligence infliction of emotional distress, and negligent misrepresentation, even though the complaint pleads intentional conduct in the alternative.  Second, they assert that the harms alleged in the underlying complaints—harm to the deceased's corpses and the emotional harm suffered by the Underlying Plaintiffs—constitute "property damage" and "bodily injury," respectively.  Third, as for the Morticians' endorsement, they contend that the allegations of negligence amount to an exercise of the Liberty Defendants' professional expertise.  Fourth, they argue that the public policy bar against insurance defense/indemnification for criminal acts does not apply to all of the claims in the underlying complaints, as the claims of negligence are not criminal, and they contend that the Liberty Defendants' guilty pleas have no impact on this litigation.  As to Nationwide's contention that the Underlying Plaintiffs made a judicial admission in their answer concerning the intentionality of the Liberty Defendants, the Underlying Plaintiffs argue that the underlying complaints, which are incorporated in the answers, sufficiently plead acts of negligence.

## 2.    Recent Developments in the Underlying Litigation

As noted above, Nationwide sent a letter on July 20, 2009, which was placed on the record, notifying the Court of recent developments in the underlying litigation of the Samanns

and Laberta matters.  (07-4767, Doc. 53; 08-3895, Doc. 93).  In those cases, Judge Tereshko granted preliminary objections for some of the defendants after holding that Pennsylvania law does not recognize a claim for negligent infliction of emotional distress for abuse of a corpse. Nationwide contends that there is no reason to believe that Judge Tereshko would come to any different conclusion on the other cases before him, as each of the cases is essentially identical on the facts and the complaint.

On August 7, 2009, counsel for the Underlying Plaintiffs in both actions responded to Nationwide's letter.  (07-4767, Doc. 54; 08-3895, Doc. 94).  The Underlying Plaintiffs insist that Judge Tereshko's decisions are not dispositive of this Court's analysis for the duty to defend, as the Underlying Plaintiffs will appeal his decisions as soon as possible, and the duty to defend should exist "until such time as the Pennsylvania appellate courts decide once and for all" the validity of Judge Tereshko's decision.

### 3.     Supplemental Briefing Post-Oral Argument

In the supplemental briefing filed by the parties after oral argument, Nationwide and the Underlying Plaintiffs offered several arguments in addition to supporting those offered in the initial briefing.  First, Nationwide argues that, even assuming the Liberty Defendants caused "property damage" for purposes of the CGL, a provision in the CGL excludes "property damage" that occurred while the property was in the "care, custody or control" of the insured.  Because the underlying complaints explicitly allege that the corpses were in the care, custody, or control of the Liberty Defendants when the alleged "property damage" occurred, this exclusion would bar coverage through the CGL.  Nationwide also notified the Court that Judge Tereshko issued an order on August 26, 2009 in the Laberta case, dismissing the claims against the Liberty

-19-

Defendants of negligence, negligent infliction of emotional distress, breach of fiduciary duty, and the consumer protection claims.  Nationwide insists that the only claims remaining against the Liberty Defendants are for conspiracy, intentional infliction of emotional distress, and fraud/deceit, which are certainly barred from coverage.[9]  According to Nationwide, this decision absolves it from further defending the Liberty Defendants in the <u>Laberta</u> proceedings.  Third, Nationwide points to the underlying complaint in <u>Maggio</u> as significantly dissimilar from the other underlying complaints, and contends that even if the Court would find that the duty to defend is triggered by the allegations in the other underlying complaints, the <u>Maggio</u> underlying complaint does not sufficiently allege negligent conduct.

In the Underlying Plaintiffs' supplemental brief, they first offer the Pennsylvania Superior Court's decision in <u>Glikman v. Progressive Cas. Ins. Co.</u>, 917 A.2d 872 (Pa. Super. 2007), for the proposition that an insurance policy's definition of "bodily injury" can include pure emotional distress claims.  Second, the Underlying Plaintiffs also notify the Court of Judge Tereshko's recently issued orders of August 25, 2009 in both the <u>Laberta</u> and the <u>Oprea</u> litigation, where Judge Tereshko granted the Liberty Defendants' preliminary objections as to some of the outstanding claims but did not dispose of the negligent misrepresentation claims, which they argue still trigger Nationwide's duty to defend.

---

[9] Nationwide does not mention the status of the negligent misrepresentation claim in <u>Laberta</u>, which Judge Tereshko did not dismiss as to the Liberty Defendants, as opposed to the order entered in <u>Laberta</u> for Margaret McCafferty, in which he did dismiss the negligent misrepresentation claim.

**B.      General Principles for Policy Interpretation and Duty to Defend**

The only issue presented in the current Motions for Summary Judgment is whether the insurance policy covers the claims alleged in the underlying complaints.  First, "[t]he interpretation of an insurance policy is a question of law . . . ."   <u>Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.</u>, 908 A.2d 888, 897 (Pa. 2006) (citing <u>401 Fourth Street v. Investors Ins. Co.</u>, 879 A.2d 166, 170 (Pa. 2005)).  Courts may therefore dispose of cases on summary judgment where the sole issue concerns the interpretation of the policy.

There are several well-recognized principles under Pennsylvania law that courts utilize in interpreting the legal meaning of terms in an insurance policy.  Those words in the policy that are of common usage should be "construed according to their natural, plain, and ordinary sense."  <u>Kvaerner</u>, 908 A.2d at 897.

> Our purpose in interpreting insurance contracts is to ascertain the intent of the parties as manifested by the terms used in the written insurance policy.  When the language of the policy is clear and unambiguous, we must give effect to that language.  However, when a provision in the policy is ambiguous, the policy is to be construed in favor of the insured to further the contracts [sic] prime purpose of indemnification and against the insurer, as the insurer drafts the policy and controls coverage.

<u>Donegal Mut. Ins. Co. v. Baumhammers</u>, 938 A.2d 286, 290 (Pa. 2007) (internal citations and quotations omitted).

For purposes of interpreting the terms of insurance polices to determine whether the duty to defend or duty to indemnify are applicable, the duty to defend is broader than the duty to indemnify.  Where the underlying complaint makes at least one allegation that falls within the scope of the policy's coverage, the duty to defend is triggered, even if an insured is ultimately

found to be not liable.  See Gen. Accident Ins. Co. of Am. v. Allen, 692 A.2d 1089, 1095 (Pa.

1997); USAA Cas. Ins. Co. v. Bateman, 2008 WL 4761718, at *4 (E.D. Pa. Oct. 30, 2008)

(Baylson, J.).

        In determining whether the underlying litigation falls within the scope of the insurer's

duty to defend, a court must examine only those factual allegations made within the "four

corners" of the underlying complaint.  The duty can not be triggered by allegations outside of the

complaint, including discovery responses produced in either the underlying litigation or the

insurance dispute litigation.  See Kvaerner, 908 A.2d at 896 ("[A]n insurer's duty to defend is

triggered, if at all, by the factual averments contained in the complaint itself.").  Coverage is also

not triggered by simply including a covered claim without offering factual allegations in support

of the covered claim.  Rather, courts must look at the factual allegations in the complaint to

determine whether the lawsuit genuinely falls within the scope of the duty.  Mutual Ben. Ins. Co.

v. Haver, 725 A.2d 743, 745 (Pa. 1999) ("[T]he particular cause of action that a complainant

pleads is not determinative of whether coverage has been triggered.  Instead it is necessary to

look at the factual allegations contained in the complaint."); Bateman, 2008 WL 4761718, at

*4.[10]

---

[10] The Pennsylvania Supreme Court elaborated on this principle in Allen: "After
determining the scope of coverage, the court must examine the complaint in the underlying
action to ascertain if it triggers coverage.  If the complaint against the insured avers facts that
would support a recovery covered by the policy, then coverage is triggered and the insurer has a
duty to defend until such time that the claim is confined to a recovery that the policy does not
cover. . . . Although the duty to defend is separate from and broader than the duty to indemnify,
both duties flow from a determination that the complaint triggers coverage."  Allen, 692 A.2d at
1095.

C.    Liberty CGL Coverage Form

     1.    Whether Underlying Complaints Sufficiently Allege an "Occurrence"

First, Nationwide argues that the underlying complaints filed by the Underlying Plaintiffs do not come within the scope of the Commercial General Liability Coverage form, even before considering any of Judge Tereshko's decisions in the underlying cases.  Nationwide primarily bases this argument on its conclusion that the claims based in negligence in the underlying complaints are not supported by their corresponding factual allegations.

As delineated above, the CGL Policy states that Nationwide will:

> pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

(CGL at 1).  That duty only exists where the "bodily injury" or property damage" are caused by an "occurrence" (id.), which is defined as an "accident" (CGL at 13).

"The term 'accident' within insurance polices refers to an unexpected and undesirable event occurring unintentionally, and [] the key term in the definition of the 'accident' is 'unexpected' which implies a degree of fortuity."  Baumhammers, 938 A.2d at 292 (citing Kvaerner, 908 A.2d at 898).  What particular claims an underlying plaintiff brings against the insured, however, is not the end of the analysis.  Rather, "it is necessary to look at the factual allegations contained in the complaint."  Haver, 725 A.2d at 745.  The parties implicitly agree that the issue of whether an "occurrence" is alleged depends on whether the underlying complaints make genuine factual allegations of negligence, rather than only factual allegations of

intentional conduct.  See, e.g., USAA Cas. Ins. Co. v. Bateman, 2008 WL 4761718, at *7 (E.D.

Pa. Oct. 30, 2008) (Baylson, J.) (rejecting an insured's argument, on the insurer's motion for

summary judgment, that underlying complaint for misrepresentations during the sale of a home

was an "accident," though noting that "pure negligence claims do come within the scope of an

'accident'"); Allstate Ins. Co. v. Key-Berthau, 2008 WL 5382924 (E.D. Pa. Dec. 19, 2008)

(Baylson, J.) (accepting insured's argument, on the insurer's motion for judgment on the

pleadings, that underlying complaint, which alleged that the insured negligently provided her son

with a gun that the son used in a fight with the underlying plaintiff, alleged an "occurrence" and

was sufficiently "accidental").

     The dispute between the parties, then, concerns whether the underlying complaints have

sufficiently and genuinely alleged the negligence of the Liberty Defendants.  See State Farm Fire

& Cas Co. v. Corry, 324 F. Supp. 2d 666, 672 (E.D. Pa. 2004) (Pollak, J.) ("[U]nder

Pennsylvania law, injuries caused by negligence are considered to be the result of 'accidents'

within the meaning of insurance policies, and, correspondingly, negligence claims do not fall

within policy exclusions for injuries 'expected or intended' by the insured." (internal citations

omitted)).

     Contrary to Nationwide's repeated assertions that only intentional acts are alleged, the

Underlying Plaintiffs have sufficiently alleged acts of negligence in the underlying complaints.

As noted above in the discussion of the underlying complaints, the Underlying Plaintiffs make

several factual allegations within their counts of negligence, negligent infliction of emotional

distress, and negligent misrepresentation which trigger the policy's duty to defend.  For instance,

in the negligence count, the Underlying Plaintiffs allege that the Liberty Defendants negligently

failed to obtain and/or verify consent before allowing decedent's tissue to be harvested

(Schaming Compl. ¶¶ 63(a)-(c); Oprea Compl. ¶¶ 61(a)-(c)), negligently prepared, provided, and

relied upon inaccurate documentation (Schaming Compl. ¶¶ 63(d)-(h), (k); Oprea Compl. ¶¶

61(d)-(h), (k)), and negligently entrusted the decedents to BTS for tissue harvesting, or failed to

prevent BTS from harvesting tissue, when the Liberty Defendants knew the decedents were not

candidates for tissue harvesting (Schaming Compl. ¶¶ 63(i)-(j); Oprea Compl. ¶¶ 61(i)-(h)).  The

counts for negligent infliction of emotional distress[11] and negligent misrepresentation[12] also

include genuine factual allegations of negligence.  The portions of the underlying complaints that

Nationwide relies on, which allege that the Liberty Defendants had purposely conspired with

BTS and purposely engaged in this organ harvesting scheme, are offered in the alternative to the

negligence allegations.

     Nationwide effectively seeks to set aside these allegations of negligence in the underlying

complaints because either the allegations of intentional conduct are more prevalent, or because

the Liberty Defendants have pled guilty in the criminal proceedings.  As to the first, to accept

such a principle would limit an insurer's obligation to defend insureds where the underlying

---

     [11] In the count for negligent infliction of emotional distress, the underlying complaints allege that the Liberty Defendants negligently caused the underlying plaintiffs severe emotional distress and anguish.  (Schaming Compl. ¶ 85; Oprea Compl. ¶ 83).

     [12] In the count for negligent misrepresentation, the underlying complaints allege that the Liberty Defendants negligently misrepresented that:  the casket would not be opened (Schaming Compl. ¶ 131; Oprea Compl. ¶ 129), the decedent would be cremated without any organ harvesting (Schaming Compl. ¶ 132; Oprea Compl. ¶ 130), and the Underlying Plaintiffs' directives would be honored in the decedent's disposition (Schaming Compl. ¶ 133; Oprea Compl. ¶ 131).  They also allege that the Liberty Defendants knew or should have known that the decedent's tissue and organs would be harvested while in their care.  (Schaming Compl. ¶ 134; Oprea Compl. ¶ 132).

complaints alternatively plead both intentional and negligent conduct.  In such cases, insurers

could effectively disclaim their duty to defend by arguing that the allegations of intentional

conduct are more prevalent in the underlying complaint.  Nationwide has not offered any caselaw

that establishes such a principle, which would permit insurance companies to avoid their

contractual duty.[13]

---

[13] Nationwide asserts that negligence claims have been set aside by courts in similar cases through the use of the "gist of the action" doctrine.  The cases cited, however, do not dismiss the negligence allegations due to the intentional conduct allegations being more prevalent, as Nationwide essentially suggests here.  Instead, the courts held that the gist of the action doctrine is meant to "preclude[] plaintiffs from re-casting ordinary breach of contract claims into tort claims."  Freestone v. New England Log Homes, Inc., 819 A.2d 550, 554 (Pa. Super. 2003) (reversing trial court on motion for judgment on the pleadings and holding that underlying complaint's claim for negligence, in addition to claims for breach of contract and breach of warranty, arising out of sale and poor service by seller of log home kit, did not constitute "occurrence" due to gist of the action doctrine).

In Atlantic Mut. Ins. Co. v. Gula, 926 A.2d 449, 452 (Pa. Super. 2007), the Pennsylvania Superior Court held that, on appeal from motions for summary judgment on issue of duty to defend, underlying complaint did not allege an "occurrence."  The court stated that the underlying complaint, which sought damages for treatment received after suffering workplace injury, only alleged that the insured medical provider referred the insured to a doctor and that there was no allegation of a negligent act on the part of the insured.  Id. at 452.  The court held in the alternative that, assuming the insured was associated with the underlying plaintiff's first doctor who allegedly improperly recommended against surgery, professional negligence does not constitute an "occurrence" for purposes of CGL.  Id.  In explaining this alternative rationale, the court did not rely on any caselaw, and Nationwide has not pursued this theory in regards to the Liberty Defendants.  Even if Nationwide did pursue this argument, this would only tend to support the Underlying Plaintiffs' argument in this case that the Morticians' endorsement applied.

In Erie Ins. Exchange v. Heisey, 81 Pa. D. & C. 4th 18 (Pa. Com. Pl. 2007), the court granted the insurer's motion for summary judgment in a declaratory judgment action.  The court held that the policy's duty was not triggered by the underlying complaint where the complaint alleged that the insured shot the victim three times in the head.  There were no additional allegations of negligence.

In Nationwide Mut. Fire Ins. Co. v. Larkin, 2006 Pa. Dist. & Cnty. Dec. LEXIS 133 (Pa. Com. Pl. 2006), the court recommended that its decision be affirmed where it had earlier granted the insurer's motion for judgment on the pleadings in a declaratory judgment action.  The court held that the underlying complaint did not sufficiently allege an "occurrence," where the factual allegations only alleged that the insured repeatedly struck the underlying plaintiff three

As to the second, that the allegations of negligence should be set aside due to the Liberty Defendants' criminal convictions, such a claim has been rejected by the Pennsylvania courts, as the Underlying Plaintiffs, and Nationwide itself, point out.  See Erie Ins. Exch. Co. v. Muff, 851 A.2d 919, 930 (Pa. Super. 2004) (rejecting an insurer's argument that a criminal conviction of insured babysitter precludes underlying plaintiffs from pursuing allegations of negligence in civil action since the court could not "conclusively ascertain whether the jury's verdict included a consideration of the allegedly negligent acts raised in the civil complaint").[14]

Next, in its July 30, 2009 letter to the Court, Nationwide challenges the legitimacy of the Underlying Plaintiffs' claims in all of the underlying state court cases in light of Judge Tereshko's decisions in the Laberta and Samanns cases.  It argues that Judge Tereshko's decision

_____

times in the face and caused the underlying plaintiff to suffer a detached retina.  The court held that "the complaint fails to plead any facts from which it could be reasonably determined that Mr. Larkin struck him in the face three times 'accidentally.'"  Id. at *4.

In GE Aquarium, Inc. v. Harleysville Mut. Ins. Co., 2004 Phila. Ct. Com. Pl. LEXIS 48 (Pa. Com. Pl. 2004), the court granted the insurer's motion for summary judgment in a declaratory judgment action on the duty to defend the insured.  The underlying complaint alleged that the insured pet store had sold animals with undisclosed health problems.  The court granted the motion upon concluding that the underlying complaint no longer alleged an "occurrence," since the court in the underlying litigation had dismissed the negligence claims and the only allegations remaining were those claiming intentional acts of fraud, breach of warranty, and violations of state consumer protection statutes.  Id. at *9-10.

[14] Nationwide itself rejects a similar contention in its Response to Margaret McCafferty's Motion to Stay, when it argues that it is not bound by the resolution of factual issues in the underlying litigation since it is not in privity with any of the parties in those proceedings.  (08-3895, Doc. 83, at 7) (citing Vaksman v. Zurich Gen. Accident & Liability Ins. Co., 94 A.2d 186 (Pa. Super. 1953); Greenway Center, Inc. v. Essex Ins. Co., 475 F.3d 139 (3d Cir. 2007); Ranger Ins. Co. v. Gen. Accident Fire & Life Assurance Co., 800 F.2d 329 (3d Cir. 1986)).  In that brief, Nationwide argues that these cases stand for the proposition that "where insurer's interests and those of policyholder are averse, findings in underlying state court action do not estop insurer from litigating coverage defenses."  (08-3895, Doc. 83, at 7).  Nationwide has not argued why this rule would be any different for the issue at hand.

suggests that he will dismiss the negligent infliction of emotional distress claims in the other cases concerning the mishandling of the family members' corpses.  However, Nationwide fails to establish that, even assuming these claims do not have a legal basis and will be dismissed, this Court should analyze the merits of the claim to determine whether the duty to defend is triggered. Indeed, Pennsylvania courts have held that an insurer has a duty "to defend against groundless, false, or fraudulent claims brought against its insured regardless of [the insurer's] ultimate liability to pay, so long as the claims are potentially within the scope of the policy."  Muff, 851 A.2d at 931; see also Britamco Underwriters, Inc. v. Weiner, 636 A.2d 649, 651 (Pa. Super. 1994) ("[T]he insurer agrees to defend the insured against any suits arising under the policy 'even if such suit is groundless, false, or fraudulent.'" (quoting Gedeon v. State Farm Mutual Automobile Ins. Co., 188 A.2d 320, 321 (Pa. 1963))).  Given this premise, this Court's role, in adjudicating only the declaratory judgment action brought by the insurer, does not include considering the merits of the underlying claims.

Where the legitimacy of the underlying claims comes into play is at the point that the claims are dismissed from the underlying litigation.  Only after the triggering claims—those claims that came within the scope of the insurance policy and triggered the insurer's duty to defend—are dismissed from the underlying litigation can the insurer properly cease providing a defense to the insured.  However, "[a]n insurer who refuses to defend its insured from the outset does so at its peril, because the duty to defend remains with the insurer until it is clear the claim has been narrowed to one beyond the terms of the policy."  Muff, 851 A.2d at 926 (quoting Board of Public Educ. of School Dist. of Pittsburgh v. Nat'l Union Fire Ins. Co. of Pittsburgh,

709 A.2d 910, 913 (Pa. Super. 1998)).  Until that time, the insurer must continue to provide a defense.

The final argument raised by Nationwide on whether an  "occurrence" has been alleged concerns the Underlying Plaintiffs' answer to Nationwide's Second Amended Complaints.  In their Second Amended Complaint for both 07-4767 and 08-3895, where Nationwide outlined the alleged organ harvesting scheme, Nationwide alleged that the Liberty Defendants acted purposely, with the agreement and common understanding of the other Liberty Defendants and BTS, to harvest the body organs of the deceased for profit.[15]  In responding to these allegations in their answer, the Underlying Plaintiffs stated the following:

> ¶ 44 / ¶ 58 - Admitted in part; denied in part.  Upon information and belief, the [Liberty Defendants] provided access to corpses for the purpose of harvesting. . . .
> ¶ 45 / ¶ 59 - Denied as stated.  Upon information and belief, answering defendants admit only that the identified individuals gave access to BTS to bodies for the purpose of harvesting in exchange for money. . . .
> ¶ 49 / ¶ 63 - Admitted in part; denied in part.  Answering defendants admit only that in their individual circumstance they did not provide authorization or consent to the harvesting of tissue or body parts from their deceased, and, upon information and belief the individuals named in the corresponding paragraph of the

_____

[15] See (07-4767, Doc. 44 ¶¶ 44, 45, 49) (¶ 44:  "[The Liberty Defendants] entered into an agreement, common understanding and/or joint venture to supply corpses entrusted to them and/or their respectively owned or operated funeral homes for burial or to Liberty Cremation, Inc. for cremation, to Biomedical Tissue Services, Ltd. and Michael Mastromarino, its/his agents, servants or employees (collectively referred to as "BTS") for the purpose of harvesting bone or tissue, ultimately for sale by BTS to tissue processing companies for use in allograft procedures." ¶ 45:  "[The Liberty Defendants] were each paid money by BTS for each corpse delivered to BTS which was dissected for body parts and tissue."  ¶ 49:  "[The Liberty Defendants] were aware that neither they nor BTS obtained consent for the harvesting from corpses provided to them. Gerald Garzone, Louis Garzone and James McCafferty were aware that BTS was contacted shortly after they acquired possession of a corpse and that no time existed for BTS to secure consent from the family members for harvesting."); (08-3895, Doc. 63 ¶¶ 58, 59, 63) (same).

> Declaratory Judgment Complaint were aware of the absence of
> consent at the time they contacted BTS to provide access to their
> deceased corpses for the purpose of harvesting. . . .

(07-4767, Doc. 45 ¶¶ 44, 45, 49; 08-3895, Doc. 64 ¶¶ 58, 59, 63).  Nationwide characterizes

these responses as judicial admissions and argues that the Underlying Plaintiffs are now legally

precluded from arguing that the Liberty Defendants acted negligently.

Nationwide has not offered any caselaw on the impact of admissions through answers for

insurance coverage litigation.  The only citations it offers simply state that judicial admissions in

answers are binding, which does not clearly govern the issue at hand.  Courts considering the

duty to defend in a declaratory judgment action are directed to exclusively consider the factual

allegations in the underlying complaint to determine whether the duty to defend has been

triggered.  See Kvaerner, 908 A.2d at 896.  Nonetheless, the answers that the Underlying

Plaintiffs filed here are not the direct admissions that Nationwide makes them out to be.  For

each of the responses, the Underlying Plaintiffs either denied Nationwide's allegations in part or

denied them in their entirety.  (07-4767, Doc. 45 ¶¶ 44, 45, 49; 08-3895, Doc. 64 ¶¶ 58, 59, 63).

In addition, the responses can in no way be characterized as clear admissions of intentional

conduct.  And if there was any doubt, the underlying complaints filed by the Underlying

Plaintiffs and referenced in their Answers include many genuine factual allegations of negligence

that fall within the scope of the duty to defend.

Because the Underlying Plaintiffs have offered sufficient allegations of negligence in the

underlying complaints,[16] the underlying complaints sufficiently allege an "occurrence" for

---

[16] Though Nationwide also makes the argument that the "intentional act" exclusion in the
policy also prohibits coverage, the analysis for that issue is effectively the same in this case as
determining whether an "occurrence" is alleged.  As the Pennsylvania Supreme Court recognized

purposes of the CGL form.  However, this is not the end of the inquiry in determining whether the CGL's duty to defend is triggered by the underlying complaints.

### 2.      Whether Underlying Complaints Concern Harms of "Property Damage" or "Bodily Injury"

Nationwide next argues that the Underlying Plaintiffs do not allege, or seek to redress, harms that constitute "bodily injury" or "property damage" under the terms of the CGL policies.

The Underlying Plaintiffs identify two types of harm in the underlying complaints.  First, they allege that the acts committed by BTS and its employees and the negligent acts of the Liberty Defendants caused "property damage," as the corpses were the property of the surviving family members.  Second, the Underlying Plaintiffs allege that the result of the acts—"severe pain and suffering, severe emotional distress, mental anguish and harm, etc."—constitute "bodily injury."

The Underlying Plaintiffs' argument concerning "property damage" is unavailing.  At the outset, it is by no means settled under Pennsylvania law that a deceased body is the "property" of the family, nor is it settled that harvesting the organs of the deceased is "damage" to that "property."  See Whitson v. City of Philadelphia, 2008 WL 4739532, at *5-*6 (E.D. Pa. Oct. 27, 2008) (Buckwalter, J.) (noting, on a motion for partial judgment on the pleadings, the "unsettled law in Pennsylvania" concerning whether a corpse is the property of the next of kin, in construing the Pennsylvania Political Subdivision Tort Claims Act).  It is also important to note that the

---

in Minnesota Fire & Cas. Co. v. Greenfield, 855 A.2d 854 (Pa. 2004), "the question is not whether the [liability-producing act] was an 'intentional act,' but rather whether the resulting property damage was 'intentionally caused' by the insured."  Id. at 862 n.8 (quoting Eisenman v. Hornberger, 264 A.2d 673-74 (Pa. 1970)).

underlying complaints fail to specifically identify this alleged property damage, instead only

seeking compensation for "severe pain and suffering, severe emotional distress and mental

anguish and harm, financial or economic loss, including but not limited to, present and future lost

wages, and other damages.[17]"  See, e.g., (Schaming Compl. ¶ 76; Oprea Compl. ¶ 74).

In any event, the CGL contains a policy exclusion concerning property damage while in

the custody of the insured.  The policy states:

> 2.  Exclusions
> This insurance does not apply to: . . . .
> j.  Damage To Property
> "Property damage" to: . . . .
> (4) Personal property in the care, custody or control of the insured .
> . . .
> Paragraphs (1), (3) and (4) of this exclusion do not apply to
> "property damage" (other than damage by fire) to premises,
> including the contents of such premises, rented to you for a period
> of 7 or fewer consecutive days.  A separate limit of insurance
> applies to Damage To Premises Rented To You as described in
> Section III - Limits Of Insurance. . . .
> Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to
> liability assumed under a sidetrack agreement.

(CGL at 4).  If this Court assumes, as the Underlying Plaintiffs argue, that the deceased family

members' bodies were the personal property of the Underlying Plaintiffs and that the acts

committed by the Liberty Defendants caused "property damage," the corpses of the Underlying

---

[17] Nationwide notes, and the Underlying Plaintiffs do not contest, that lost wages alone also do not constitute "bodily injury" or "property damage."  "There is no duty to defend a claim asserting solely intangible economic losses because such losses do not constitute damage to injury to [sic] tangible property."  GE Aquarium, Inc. v. Harleysville Mut. Ins. Co., 2004 Phila. Ct. Com. Pl. LEXIS 48 (Pa. Com. Pl. 2004) (citing Int'l Ins. Co. v. St. Paul Fire & Marine Ins. Co., 1988 U.S. Dist. Lexis 12215 at * 18 (E.D. Pa. 1988)).

Plaintiffs were allegedly entrusted to the care, custody, or control of the Liberty Defendants.[18]
Even if "property damage" did occur, it was caused or facilitated while the corpses were in the
custody of the Liberty Defendants.  Under the terms of the CGL, any property damage of this
type is clearly excluded from the policy, and therefore Nationwide does not have a duty to defend
against allegations arising from such damage.

The Underlying Plaintiffs also contend that the emotional effect of these harms
constitutes "bodily injury" under the terms of the policy.  However, the Underlying Plaintiffs do
not confront the current caselaw on emotional harm and "bodily injury" for insurance policies.
As many of the cases recognize, "Pennsylvania courts have soundly rejected the contention that
policy definitions of injury or bodily injury encompass mental or emotional harm."  Babalola v.
Donegal Group, Inc., 2008 WL 4006721, at *3 (M.D. Pa. Aug. 26, 2008) (Kane, C.J.); GE
Aquarium, Inc. v. Harleysville Mut. Ins. Co., 2004 Phila. Ct. Com. Pl. LEXIS 48, at *5 (Pa.
Com. Pl. 2004) (Jones, J.) (citing Jackson v. Travelers Ins. Co., 606 A.2d 1384 (Pa. Super.
1992); Kline v. Kemper Group, 826 F. Supp. 123 (M.D. Pa. 1993), aff'd, 22 F.3d 301 (3d Cir.
1994); ARC Water Treatment Co. of Pa., Inc. v. Hartford Cas. Ins. Co., 2002 WL 32392683
(E.D. Pa. Mar. 27, 2002) (Green, J.); Legion Indem. Co. v. CareStat Ambulance, Inc., 152 F.
Supp. 2d 707 (E.D. Pa. 2001) (Giles, C.J.); see also Miller v. Quincy Mut. Fire Ins. Co., 2003

---

[18] See, e.g., (Schaming Compl. ¶ 18) ("Plaintiff, Jan Schaming, entrusted the care of
decedent's body to Liberty in Philadelphia for the purpose of cremation."); (Oprea Compl. ¶ 16)
("Plaintiff, Daniel Oprea, entrusted the care of decedent's body to Liberty in Philadelphia for the
purpose of cremation."); (Schaming Compl. ¶ 36) ("Plaintiffs allege that certain funeral directors,
funeral homes and crematories, including, but not limited to Liberty, G. Garzone, L. Garzone and
McCafferty provided Mastromarino, Nicelli, Cruceta, Aldorasi, Vickers, or their officers, agents
and/or employees access to the corpses that had been entrusted to and were under the funeral
home's/crematory's care for proper disposition in order to harvest body parts."); (Oprea Compl. ¶
34) (same).

WL 23469293, at *5 (E.D. Pa. Dec. 4, 2003) (Yohn, J.) (concluding that "the weight of authority [in Pennsylvania] is that there must be some physical injury to the body alleged in order to constitute 'bodily injury'" for purposes of insurance policy interpretation); Allstate Ins. Co. v. Montalbano, 2001 WL 876793, at *2 (E.D. Pa. May 17, 2001) (Kauffman, J.) (declaring insurance company had no duty to defend or indemnify because "emotional distress" did not fall within the policy's coverage for "bodily injury" under Pennsylvania law).

"Generally, a complaint alleging only physical manifestations of mental or emotional harm likewise fails to trigger coverage under a policy insuring against claims brought for 'bodily injury.'" Babalola, 2008 WL 4006721, at *3; see also GE Aquarium, 2004 Phila. Ct. Com. Pl. LEXIS 48, at *5-6 ("The Pennsylvania Superior Court has also determined that physical symptoms that result from mental and emotional harm do not constitute 'bodily injury' for purposes of insurance law." (citing Zerr v. Erie Ins. Exch., 667 A.2d 237 (Pa. Super. 1995))); Legion Indem. Co. v. Carestate Ambulance, Inc., 152 F. Supp. 2d 707, 719 (E.D. Pa. 2001) (Giles, C.J.).

In Legion Indemnity, Chief Judge Giles reasoned that emotional distress does not constitute bodily injury for insurance policy purposes under Pennsylvania law. Id. The Legion Indemnity plaintiff brought a declaratory judgment action seeking a ruling that it did not have to indemnify the defendant for the liability arising from the underlying litigation. Id. The underlying plaintiff, a widow, claimed that she was suffering emotional distress that manifested itself in physical conditions as a result of witnessing her husband's death. Id. The insurance policy's definition of "bodily injury" was virtually identical to the one at hand: "'bodily injury, sickness or disease sustained by a person, including death . . . .'" Id. at 712. Chief Judge Giles

held that the underlying plaintiff's emotional distress was not covered under the insurance policy because the physical symptoms only manifested subsequent to the event.  Id. at 719.

In this case, the Underlying Plaintiffs' contention that emotional distress constitutes bodily injury is clearly against the weight of Pennsylvania law.  The definition of "bodily injury" in the CGL is identical to that in Legion Indemnity, which the court held did not include emotional distress.  Further, the Underlying Plaintiffs did not even allege in the underlying complaint that their emotional distress has produced physical manifestations, unlike the Legion Indemnity underlying plaintiff.

Attempting to overcome this precedent, the only case the Underlying Plaintiffs have cited for the proposition that "bodily injury" may include emotional distress is Glikman v. Progressive Cas. Ins. Co., 917 A.2d 872 (Pa. Super. 2007).  In Glikman, the plaintiff was walking across a road with her husband when an insured motorist struck and killed the husband.  After being diagnosed with post-traumatic stress disorder as a result of witnessing the incident, the plaintiff filed suit against the insurer for failure to provide benefits.  The insurer contended that the plaintiff's post-traumatic stress disorder did not occur as a result of "bodily injury."  In considering whether coverage was appropriate, the court focused on the definition of bodily injury:  "The policy defines 'bodily injury' as 'bodily harm, sickness, or disease, including death that results from bodily harm, sickness, or disease.'"  Id. at 873.  The court recognized that the insurer specifically admitted that the plaintiff's post-traumatic stress disorder was a "disease," and the court held that coverage therefore existed in this case since the policy defined "disease" as a covered injury "separate from bodily harm."  Id. at 874.

Glikman can be briefly addressed.  First, the Underlying Plaintiffs have not identified any underlying complaint which alleges that an underlying plaintiff developed post-traumatic stress disorder or a similar condition as a result of the Liberty Defendants' conduct.  In addition, Nationwide has in no way admitted that the emotional harms alleged in this case are a "disease," as the insurer did in Glikman.  For these reasons, the Pennsylvania Superior Court's decision is inapplicable, particularly in light of the overwhelming number of cases coming to the opposite conclusion on claims for emotional distress.

In accordance with the above precedent, the emotional distress that the Underlying Plaintiffs allege does not rise to the level of "bodily injury" as contemplated by the insurance policy and Pennsylvania law.  As the claims alleged in the underlying complaints do not seek redress for "bodily injury" or "property damage," the underlying complaints do not trigger the duty to defend under the CGL.

### D.    Liberty Morticians' Endorsement

Next, the parties dispute the applicability of the Morticians' Professional Liability Coverage endorsement in the Liberty policy.  The Morticians' endorsement, modifying the coverage and terms provided for in the CGL, states that Nationwide will:

> pay those sums that the insured becomes legally obligated to pay as damages arising out of an occurrence caused by:
> 1.  Bodily injury including mental anguish,
> 2.  Property damage to urns, caskets, linings or fittings, casket cases, crypts, mausoleums or other facilities for the care or burial of a deceased human body, belonging to others and in the care, custody or control of the insured, for the purpose of buying or caring for a deceased human body; or
> 3.  Property damage to property of others which is not in the care, custody or control of the insured,

-36-

> due to any professional malpractice or mistake in the
> embalming, disposition, burial, disinterment, or removal of any
> deceased human body or any conduct of any memorial service by
> the insured even though no deceased human body actually be
> present, or because of any injury to, destruction of or interference
> with the right of burial of a deceased human body.

(Pl.'s Mot. Summ. J. Ex. E at 1). The Declarations section of the form states that the insured

must "not use the premises for any undisclosed purposes, and [must] not conduct any business

operations at any undisclosed locations." (Pl.'s Mot. Summ. J. Ex. E at 1). An "occurrence,"

which is not amended by the Morticians' endorsement, is still defined as "an accident." (CGL at

13).

    In discussing the Morticians' endorsement, the parties focus primarily on the scope of the

phrase "occurrence . . . due to any professional malpractice or mistake" and its applicability to

the allegations in the underlying complaints. Professional malpractice has been defined by the

Pennsylvania Supreme Court as consisting "of 'a negligent or unskillful performance by a

physician of the duties which are devolved incumbent upon him on account of his relations with

his patients, or of a want of proper care and skill in the performance of a professional act.'"

Haver, 725 A.2d at 746 (quoting Hodgson v. Bigelow, 7 A.2d 338, 342 (Pa. 1939)). In Haver,

the contract defined "professional liability" as including "error or omission, malpractice, or

mistake in connection with rendering or failure to render professional services at your retail drug

store." Id. at 747. "This language clearly indicates that the term malpractice was intended to

cover negligent conduct, rather than intentional misconduct as advocated by Appellees." Id.

    On this issue, Nationwide contends that the underlying complaints allege only purposeful

acts by the Liberty Defendants and that they intended to harvest organs of the deceased for profit.

-37-

This argument is essentially the same as the one Nationwide made for the CGL policy.  As discussed above, however, the underlying complaints make several allegations of negligent conduct on the part of the Liberty Defendants in the alternative to the allegations of intentional conduct.  These allegations also concern acts arising out of the Liberty Defendants' professional activities.  The underlying complaints allege that the Liberty Defendants, preparing the bodies for final disposition in their roles as cremators or undertakers, negligently failed to obtain and/or verify consent for organ donation (Schaming Compl. ¶¶ 63(a)-(c); Oprea Compl. ¶¶ 61(a)-(c)), negligently prepared, provided, and relied upon documentation concerning the identification of the deceased and organ donation in preparing the bodies for final disposition (Schaming Compl. ¶¶ 63(d)-(h), (k); Oprea Compl. ¶¶ 61(d)-(h), (k)), and negligently entrusted the bodies of the decedents to BTS for tissue harvesting, or failed to prevent BTS from harvesting tissue, prior to final disposition (Schaming Compl. ¶¶ 63(i)-(j); Oprea Compl. ¶¶ 61(i)-(h)).  As discussed above, there are also many factual allegations in support of the negligent infliction of emotional distress and the negligent misrepresentation claims.

In addition, the factual allegations specifically identify conduct that concern negligent conduct "in the performance of a professional act."  Haver, 725 A.2d at 746.  Each of the specific acts or omissions of negligence committed by the Liberty Defendants—failing to properly obtain consent for organ donation, preparing or relying on faulty documentation, and negligently entrusting the bodies to BTS—focus on acts that the Liberty Defendants would go through in the final disposition of the bodies.  While the acts or omissions are alleged to be below the applicable standard of care, they each arise from the exercise of the Liberty Defendants' professional skills as cremators or undertakers.

Nationwide offers two cases, Phys. Ins. Co. & Prof. Adjustmetn Srvs., Inc. v. Pistone, 726 A.2d 339 (Pa. 1999) and NCMID Ins. Co. v. Turetsky, 2004 Phila. Ct. Com. Pl. LEXIS 53 (Ct. Com. Pl. 2004), for the proposition that not all conduct committed by professionals in their employment that triggers liability is "professional malpractice."  In Pistone, the Pennsylvania Supreme Court held that the proper inquiry for determining whether the acts at issue were professional acts or services is "whether the act that caused the alleged harm is a medical skill associated with specialized training." 726 A.2d at 344.  Despite Nationwide's reliance on these two cases, both of them concerned the sexual abuse of patients and employees, a significantly different situation than the one at hand.  The court in Pistone determined that sexual abuse of a patient was not a "medical skill associated with specialized training," id., and the court in Turetsky came to the same conclusion for a chiropractor that allegedly sexually assaulted one of his employees.  Neither of these cases can be analogized to the allegations of negligence made here—that, inter alia, the insured acted negligently in permitting BTS access to the bodies in preparing the deceased for burial or cremation.  The acts of negligence alleged here do concern the exercise of professional "skills associated with specialized training," while the allegations in the cases cited by Nationwide concerning sexual abuse do not.

Nationwide next argues that the Liberty Defendants violated the Morticians' endorsement when they acted with an "undisclosed purpose" in participating in the organ harvesting scheme. In the Declarations section, the Morticians' endorsement provides that:  "You [the insured] do not use the premises for any undisclosed purposes, and do not conduct any business operations at any undisclosed locations."  (Pl.'s Mot. Summ. J. Ex. E at 1).  Nationwide's argument once again ignores the allegations of negligence in the underlying complaints.  The counts based on

negligence do not allege that the Liberty Defendants acted with any ulterior motive.  Instead, they only allege that the Liberty Defendants acted with insufficient care in preparing the bodies of the deceased for burial or cremation.

To accept Nationwide's argument would be to cast aside legitimate allegations that were pled by the Underlying Plaintiffs.  Though the Underlying Plaintiffs may be unsuccessful in pursuing such a theory and it may be the case that Nationwide succeeds in establishing that the Liberty Defendants were engaged in a scheme to harvest the organs of deceased family members without consent, particularly in light of the Liberty Defendants' criminal convictions, that is a theory for another day.  The Court's role at this stage of the proceedings is to analyze the "four corners" of the complaints to determine whether the Underlying Plaintiffs have made genuine allegations of professional negligence in the underlying complaints.  As this Court concludes that they have done so, the duty to defend is triggered for the Morticians' endorsement.

### E.      Public Policy Prohibition on Insurance for Criminal Behavior

Nationwide next argues that it should not be obligated to defend or indemnify the Liberty Defendants on public policy grounds.  Nationwide asserts that, under the Pennsylvania caselaw, insurers are not required to defend individuals who engage in criminal conduct.

"Only in the clearest cases . . . may a court make an alleged public policy the basis of judicial decision."  Minnesota Fire & Cas. Co. v. Greenfield, 855 A.2d 854, 868 (Pa. 2004) (quoting Hall v. Amica Mutual Ins. Co., 648 A.2d 755, 760 (Pa. 1994)).  In Greenfield, the Pennsylvania Supreme Court rejected the argument that an insurer should provide coverage on public policy grounds, where the negligent act was selling cocaine to an individual who overdosed and failing to provide assistance.  The court held that, "in situations when an insured

commits a criminal act, with respect to a Schedule I controlled substance, and unintended or unexpected injuries or losses occur as a result, whether by accident or negligence, public policy will not allow coverage under the contract of insurance."  Id. at 866.

Though the Pennsylvania courts have identified such an exception for an insurer's duty to defend, the Underlying Plaintiffs have sufficiently alleged, in the alternative, that the Liberty Defendants acted negligently in permitting BTS to access the bodies of the deceased.  As these alleged acts of negligence are not criminal, the public policy exception does not apply at this stage of the proceedings.

    F.    **Duty to Defend for Liberty in Maggio**

Though the Underlying Plaintiffs offer persuasive and successful arguments as to why Nationwide has a duty to defend the Liberty Defendants in the underlying cases, those arguments do not hold true for the underlying complaint in Maggio.[19]  Despite including several claims based in negligence, the complaint never specifically alleges particular acts or omissions by Liberty or the other defendants that could be considered negligent.  The only non-conclusory, factual allegations made in the underlying complaint allege intentional conduct on the part of Liberty and the other defendants.

The Maggio complaint is the type of complaint that the Pennsylvania Supreme Court took issue with in Haver when it held that "the particular cause of action that a complainant pleads is not determinative of whether coverage has been triggered.  Instead it is necessary to look at the factual allegations contained in the complaint."  Haver, 725 A.2d at 745.  Because the underlying complaint does not offer genuine factual allegations of professional negligence sufficient to fall

---

[19] The Maggio complaint is attached at (Doc. 108 Ex. G).

within the scope of an "occurrence" or "professional malpractice," Nationwide does not have a

duty to defend the Liberty Defendants in the <u>Maggio</u> litigation.

### G.      Duty to Defend Liberty in Light of Judge Tereshko's Decisions

Since Nationwide filed the original complaints in these federal proceedings, several of the

underlying cases have developed in ways that may bear on the current summary judgment

motions.[20]  In particular, Judge Tereshko issued orders in the <u>Samanns</u>,[21] <u>Laberta</u>,[22] and <u>Oprea</u>

cases pending in the Pennsylvania Court of Common Pleas for Philadelphia County.  Nationwide

contends that for Judge Tereshko's decisions in <u>Laberta</u> and <u>Oprea</u>, where he specifically ruled

on claims made against the Liberty Defendants, those orders effectively dismissed all of the

claims that could potentially trigger the duty to defend, though the Underlying Plaintiffs point out

that the orders did not dismiss the negligent misrepresentation claims.

---

[20] The parties notified the Court of these developments in Nationwide's letter to the Court dated July 20, 2009 (08-3895, Doc. 93), Margaret McCafferty's letter to the Court dated August 5, 2009 (08-3895, Doc. 96), the Underlying Plaintiffs' letter to the Court dated August 7, 2009 (08-3895, Doc. 94), Nationwide's supplemental brief of September 4, 2009 (08-3895, Doc. 108), and the Underlying Plaintiffs' supplemental brief of September 4, 2009 (08-3895, Doc. 111).

[21] Though Nationwide points to Judge Tereshko's order in the <u>Samanns</u> case, that order concerned an entity that is not a party to this litigation.  Therefore, it has no bearing on the Court's analysis.

[22] On April 20, 2009, (08-3895, Doc. 108 Ex. A at 15-16), Judge Tereshko granted the preliminary objections of Margaret McCafferty d/b/a James A. McCafferty Funeral Home on the claims for negligence, negligent infliction of emotional distress, negligent misrepresentation, breach of fiduciary duty, the counts based on the UTPCPL, and one of the loss of consortium claims.
On August 26, 2009,(08-3895, Doc. 108 Ex. A at 22-23), Judge Tereshko granted the preliminary objections of Liberty, the Garzones, and James McCafferty, Jr. on the negligence, negligent infliction of emotional distress, breach of fiduciary duty, UTPCPL, fraud, and punitive damages claims.  A similar order was issued on August 26, 2009 in the <u>Oprea</u> case, where he granted the preliminary objections of Liberty, the Garzones, and James McCafferty, Jr. on the same claims.  (08-3895, Doc. 111 Ex. A).

First, Nationwide's argument that this Court should hypothesize what Judge Tereshko's decisions will be in the other cases before him will be rejected.  As discussed in Part IV.C.1, this Court will not assume the role of addressing the merits of the pending claims.  When Judge Tereshko does address those claims, Nationwide may refile a brief motion for summary judgment on the issue.

Nationwide's primary argument is that Judge Tereshko's decisions now limit the underlying complaints in Laberta and Oprea to claims that are not within the scope of the policy, thereby terminating the duty to defend.  The Laberta and Oprea orders dated August 26, 2009, (08-3895, Doc. 108 Ex. A at 22-23; 08-3895, Doc. 111 Ex. A), dismiss, inter alia, the claims of negligence, negligent infliction of emotional distress, and breach of fiduciary duty, but the Underlying Plaintiffs correctly note that the orders do not address Count XII of the Laberta and Oprea complaints, for negligent misrepresentation.  As discussed above, the allegations included for the negligent misrepresentation count specifically allege that the Liberty Defendants acted negligently in making misrepresentations, which arose out of their professional activities.  Because Judge Tereshko's orders in the Laberta and Oprea cases did not "confine the claim to a recovery that the policy does not cover," NorFab Corp. v. Travelers Indem. Co., 555 F. Supp. 2d 505, 513 (E.D. Pa. 2008) (Bartle, C.J.), Nationwide still has the duty to defend the Liberty Defendants in these cases.

## V.    Motion for Summary Judgment as to Margaret McCafferty d/b/a James A. McCafferty Funeral Home

Next, the parties address whether the duty defend arising from Margaret McCafferty's policies through Nationwide was triggered by the underlying complaints.  Because the James

McCafferty Funeral Home was covered through a policy different than the one that covered Liberty and because the outstanding claims are different than those against the Liberty Defendants, the duty to defend for Margaret McCafferty d/b/a James A. McCafferty Funeral Home will be addressed separately.

Though Margaret McCafferty and Nationwide disputed what policies were applicable to the underlying complaints prior to oral argument, (08-3895, Doc. 75, 87),[23] the parties agreed to provide supplemental briefing on the issues after Nationwide filed corporate affidavits concerning the applicable policies for the McCafferty Funeral Home.  Nationwide submitted the requested affidavits on September 3, 2009, (08-3895, Doc. 104, 105), and filed its supplemental brief, (08-3895, Doc. 109), to which Margaret McCafferty responded, (08-3895, Doc. 112).

**A.      James A. McCafferty Funeral Home Insurance Policies**

Nationwide asserts, (08-3895, Doc. 109), and Margaret McCafferty does not challenge, that the following is a summary of the policies that were in place for the James A. McCafferty Funeral Home through Nationwide.

**1.      2005-2008:  Businessowners Policy and Morticians' Endorsement**

Nationwide insured James McCafferty d/b/a the James A. McCafferty Funeral Home starting April 21, 2005.[24]  From April 21, 2005 to April 21, 2008, the McCafferty Funeral Home

---

[23] At oral argument, the parties were also unaware of which underlying complaints were filed against Ms. McCafferty or the McCafferty Funeral Home and which of the claims in those complaints were still active.  Though Nationwide did not address the issue in its supplemental briefing, Margaret McCafferty did identify the cases and claims.

[24] James A. McCafferty, Sr., who was the husband of Margaret McCafferty, was initially the owner of the McCafferty Funeral Home.  After he passed away, Margaret McCafferty assumed ownership of the McCafferty Funeral Home, and the Nationwide policy was adjusted to reflect the change.

was insured through a Businessowners policy.  From April 21, 2006 to April 21, 2008, the

coverage included the Mortician's Professional Liability Coverage endorsement.[25]

The terms of the Businessowners policy are substantially similar to those in the Liberty

CGL policy discussed above, including the definitions of "occurrence," "bodily injury," and

"property damage."  See (2005-2006 - 08-3895, Doc. 104 Ex. A at 14; 2006-2007 - 08-3895,

Doc. 104 Ex. B at 33; 2007-2008 - 08-3895, Doc. 104 Ex. C at 23).  In addition, the terms of the

McCafferty Funeral Home's Morticians' endorsement is identical to the one discussed above that

covered Liberty.  See (2006-2007 - 08-3895, Doc. 104 Ex. B at 12; 2007-2008 - 08-3895, Doc.

104 Ex. C at 85).

### 2.    2008-2009: Premier Businessowners Policy with Funeral Directors Endorsement

For the period of April 21, 2008 to April 21, 2009, the McCafferty Funeral Home

changed its policy to the Premier Businessowners Liability Coverage Form.  The changed

coverage also included the Funeral Directors Professional Liability endorsement.  The terms of

the Premier Businessowners form is again substantially similar to the terms of the CGL in the

Liberty policy.  See (08-3895, Doc. 105 Ex. D at 54).

The terms of the Funeral Directors endorsement, however, have no analogue in the

Liberty policy and can be readily characterized as more expansive than the other policies.  The

Funeral Director's endorsement provides that:

---

[25] The Court notes, however, that the Mortician's endorsement is included in the
insurance policy papers for the McCafferty Funeral Home for April 21, 2005 to April 21, 2006
included in Nationwide's affidavit.  (08-3895, Doc. 104 Ex. A at 10).

This endorsement modifies insurance provided under the following:  PREMIER BUSINESS OWNERS LIABILITY COVERAGE FORM

 A. In Section I, COVERAGES, under both COVERAGE A and COVERAGE B, the following is added to the Insuring Agreements:

 This insurance also applies to "bodily injury," "property damage" . . . , as those terms apply, or any other injury arising out of the rendering of or the failure to render professional services as a funeral director, but only in connection with your business. . . .

 For the coverage provided by this endorsement, the definition of "occurrence" is amended to include any act or omission arising out of the rendering of or the failure to render professional services as a funeral director. . . .

 D. In Section I, COVERAGES, under both COVERAGE A and COVERAGE B, the following is added to . EXCLUSIONS:

 This insurance, including any duty we have to defend "suits," does not apply to "bodily injury," "property damage," . . . as those terms apply, or other injury arising out of a criminal act including but not limited to fraud committed by the insured or any person for whom the insured is legally responsible. . . .

 E. Under Section II, WHO IS AN INSURED, paragraph 2.a.1)d) is replaced by the following: HOWEVER, none of these "employees" is an insured for:

 1) "Bodily injury," "property damage," . . . or other injury:

 d) Arising out of his or her providing or failing to provide professional services.

 HOWEVER, your "employees" are insured with respect to their providing or failing to provide such services in connection with your business.

(08-3895, Doc. 105 Ex. D at 87).

Nationwide and Margaret McCafferty agree that the primary policies from April 21, 2005 until April 21, 2009 (the Businessowners policy and the Premier Businessowners Liability Coverage Form) are essentially identical to the Liberty CGL policy for purposes of the duty to defend analysis.  They also apparently agree that the analysis for the Morticians' endorsement is

the same for the McCafferty Funeral Home as it was for Liberty.  The remaining disputes between the parties, then, are what underlying complaints and claims are outstanding against the McCafferty Funeral Home and which policy applies to those complaints and claims.

**B.      Complaints and Claims Outstanding Against the James McCafferty Funeral Home**

According to Margaret McCafferty, there are several underlying complaints in which she or the James A. McCafferty Funeral Home is a defendant: the Wilson/Pancoast federal class action litigation, the Laberta case, the Gibson case, the Flynn/Laurelli case, and the Entenman case.[26]  The underlying complaints generally allege that James McCafferty, Jr. was acting within the scope of his employment with the McCafferty Funeral Home when he committed the alleged acts.

The first case where Ms. McCafferty or the McCafferty Funeral Home is a defendant is the Wilson/Pancoast case consolidated in the U.S. District Court for the District of New Jersey, Civ. A. No. 08-5153.[27]  The plaintiffs in that case brought claims against the James McCafferty

---

[26] As for the Flynn/Laurelli and Entenman cases, though Margaret McCafferty or the McCafferty Funeral Home may be defendants in those cases, they are not the subject of this litigation.  The Second Amended Complaint in the 08-3895 civil action identifies the specific cases that Nationwide seeks a determination on its duty to defend where the McCafferty Funeral Home is a defendant, and these two cases are not part of that list.  See (08-3895 Second Am. Compl. ¶¶ 43-44).  Though Nationwide makes some mention of this case as a potential class action, it has not yet been certified as one.  Therefore, these two underlying cases will not be considered.

[27] Prior to the Wilson/Pancoast case being consolidated in the District of New Jersey, the case was active in the Eastern District of Pennsylvania, Civ. A. No. 08-2453, after it was removed from Pennsylvania state court.  Tutogen Medical, one of the defendants, filed the Notice of Removal on May 27, 2008.  (Civ. A. No. 08-2453, Doc. 1).  A review of the papers filed in the Notice of Removal reveals that the Wilson/Pancoast underlying complaint was initially filed in the Court of Common Pleas of Philadelphia County on April 25, 2008.

Funeral Home[28] for (i) civil conspiracy, (iii) negligence, (vi) negligent infliction of emotional distress, (vii) breach of fiduciary duty, (viii, ix, x, xi) several UTPCPL claims, (xii) negligent misrepresentation, (xiii) intentional misrepresentation, and (xiv) deceit. According to the docket and the parties, none of the claims have been dismissed or otherwise disposed of in this litigation.

The next case with Margaret McCafferty or the McCafferty Funeral Home as a defendant is Gibson. Though Nationwide had previously supplied a complaint in Gibson, (08-3895, Doc. 69 Ex. B-5), the parties informed the Court during the most recent oral argument that an amended complaint had been filed. Though the parties agreed to provide the Court with the amended Gibson complaint, only the outdated complaint was filed.

The final underlying complaint where Melissa McCafferty or the McCafferty Funeral Home is a defendant is the Laberta case pending in the Court of Common Pleas for Philadelphia County. The plaintiffs in that case brought claims against the McCafferty Funeral Home[29] for (i) civil conspiracy, (iii) negligence, (vi) negligent infliction of emotional distress, (vii) breach of fiduciary duty, (viii, ix, x, xi) several UTPCPL claims, (xii) negligent misrepresentation, (xiii) intentional misrepresentation, (xiv) deceit, and (xvii, xviii) loss of consortium. Judge Tereshko issued an order on April 20, 2009 in the Laberta case, (08-3895, Doc. 108 Ex. A at 15-16), where

---

[28] Though the underlying complaint does not allege any specific acts being taken by the McCafferty Funeral Home, it appears to allege that James McCafferty, Jr. was acting within the scope of his employment with the McCafferty Funeral Home in committing the acts. See (Wilson/Pancoast Compl. ¶ 83); (Wilson/Pancoast Compl. ¶ 106); (Wilson/Pancoast Compl. ¶ 158).

[29] The Laberta complaint once again appears to impose liability on the McCafferty Funeral Home through James McCafferty, Jr. "acting within the scope of [his] employment or authority." (Laberta Compl. ¶¶ 66, 89, 141).

he granted the preliminary objections of Margaret McCafferty d/b/a James A. McCafferty Funeral Home as to the claims of negligence, negligent infliction of emotional distress, negligent misrepresentation, breach of fiduciary duty, and the counts based on the UTPCPL.

### C.    Which Policies Apply to the Underlying Complaints

Nationwide argues that the Businessowners policy, as amended by the Morticians' endorsement, is the applicable policy for each of the underlying complaints, while Margaret McCafferty contends that the Court can not identify a particular policy to apply since some of the underlying complaints do not specifically allege when the plaintiffs became aware of the conspiracy.

According to the terms of the Businessowners policy covering the McCafferty Funeral Home from 2005 to 2008, "[t]his insurance applies: (1) To 'bodily injury' and 'property damage' only if: . . . (b) The 'bodily injury' or 'property damage' occurs during the policy period."  See (2005-2006 - 08-3895, Doc. 104 Ex. A at 14; 2006-2007 - 08-3895, Doc. 104 Ex. B at 33; 2007-2008 - 08-3895, Doc. 104 Ex. C at 23).  The Premier Businessowners policy covering the McCafferty Funeral Home from 2008 to 2009 contains identical terms, with one change.[30]  See (08-3895, Doc. 105 Ex. D at 54).  Pennsylvania courts have added a nuance to this standard by holding that "an occurrence happens when the injurious effects of the act first manifests itself in

---

[30] The Premier Businessowners Policy also provides that "[p]rior to the policy period, no insured listed under Paragraph 1. of Section II. WHO IS AN INSURED and no 'employee' authorized by you to give or receive notice of an 'occurrence' or claim, knew that the 'bodily injury' or 'property damage' had occurred, in whole or in part.  If such a listed insured knew or authorized 'employee' knew, prior to the policy period, that the 'bodily injury' or 'property damage' occurred, then any continuation, change or resumption of such 'bodily injury' or 'property damage' during or after the policy period will be deemed to have been known prior to the policy period."  (08-3895, Doc. 105 Ex. D at 54).  Neither party addressed the impact that this provision would have on the application of the 2008-2009 policy.

a way that would put a reasonable person on notice of the injury." Peerless Ins. Co. v. Brooks Sys. Corp., 617 F. Supp. 2d 348, 357-58 (E.D. Pa. 2008) (Gardner, J.); see also D'Auria v. Zurich Ins. Co., 507 A.2d 857 (Pa. Super. 1986).

### D.    Wilson/Pancoast Case

As all of the claims in the Wilson/Pancoast case remain active, Nationwide's only arguments as to why the pleadings do not trigger a duty to defend are identical to those made in its original Motion—that James McCafferty, Jr. acted intentionally.  Though the parties dispute whether the Morticians' endorsement or the more expansive Funeral Directors endorsement applies,[31] the dispute ultimately has no impact on the Wilson/Pancoast analysis.  Even if the Court assumes that Nationwide is correct in asserting that the less expansive Morticians' endorsement applies, the duty to defend would still be triggered by the Wilson/Pancoast complaint since the claims of negligence, negligent infliction of emotional distress, and negligent misrepresentation remain in the case.  More importantly, each of these claims contains several factual allegations of negligence on the part of James McCafferty, Jr. concerning acts arising out of the McCafferty Funeral Home's professional activities.  Because these claims and allegations of negligence against the McCafferty Funeral Home are still outstanding, Nationwide currently has a duty to defend the McCafferty Funeral Home in the Wilson/Pancoast case.

---

[31] Nationwide did not argue in their supplemental brief on the duty to defend analysis for any of the underlying complaints if the Funeral Directors endorsement would apply.

### E.   **Gibson** Case

As noted above, the parties have not supplied the Court with the operative complaint for

Gibson.[32]  Because the Court can not come to a conclusion on the duty to defend in that case with

the record at hand, Nationwide's Motion will be denied as to the Gibson case without prejudice.

### F.   **Laberta** Case

Finally, the parties dispute whether Nationwide has a duty to defend the McCafferty

Funeral Home in the Laberta case.  The Laberta underlying complaint specifically states that the

plaintiffs became aware of the alleged organ harvesting scheme on November 1, 2006.  See

(Laberta Compl. ¶¶ 25-26).  Using November 1, 2006 as the date of the "occurrence," the

applicable coverage is the Businessowners policy with the Morticians' endorsement.

In using these policies for the duty to defend analysis, it becomes clear that the duty to

defend is no longer applicable in Laberta.  Judge Tereshko's order of April 20, 2009, (08-3895,

Doc. 108 Ex. A at 15-16), granted the preliminary objections of Margaret McCafferty d/b/a

James A. McCafferty Funeral Home as to all of the negligence-based claims—negligence,

negligent infliction of emotional distress, and negligent misrepresentation.  Ms. McCafferty

argues that there is a factual allegation of negligence in one of the paragraphs within the civil

conspiracy count.  However, a factual allegation of negligent conduct, by itself, is insufficient to

trigger the duty.  While a consideration of the factual allegations is important, the proper inquiry

---

[32] The Court notes that the outdated complaint in Gibson, which is on the record, retains
the pleading issues that were identified during the oral argument for Nationwide's first summary
judgment motion.  The first paragraphs in each of the sections of the negligence-based counts in
the Gibson complaint incorporate all prior factual allegations, including the allegations of
intentional conduct.  The Court still has concerns with what impact this incorporation would
have on the duty to defend analysis.

is whether "the complaint against the insured avers facts <u>that would support a recovery covered by the policy</u>." <u>Allen</u>, 692 A.2d at 1095 (emphasis added).  Though the Court is certainly required to consider the factual allegations, "coverage is triggered and the insurer has a duty to defend until such time that the claim is confined to a recovery that the policy does not cover." <u>Id.</u> The threshold issue, then, concerns whether any of the outstanding <u>claims</u> fall within the scope of the policy, not simply whether there are any factual allegations in the complaint of negligent conduct.

The claims remaining in the case are supported by allegations of a frighteningly elaborate scheme to prey on the bodies of the deceased and violate the trust of the loved ones who entrusted the bodies to the defendants.  If it was the case that the alleged McCafferty involvement in the organ harvesting scheme occurred at its disclosed address of 6711 Frankford Avenue in Philadelphia, (Doc. 104 Ex. A), then its activities in this scheme would clearly be an "undisclosed purpose" in violation of the Morticians' endorsement, (Doc. 109 Ex. A).  On the other hand, if the acts occurred at another address, that location was undisclosed to Nationwide, again violating the Morticians' endorsement.  In addition, the phrase "occurrence . . . due to any professional malpractice or mistake" does not cover the claims based on intentional conduct remaining in the case.  Finally, the remaining allegations in <u>Laberta</u> establish a criminal conspiracy and scheme to harvest body organs without consent, prohibited by at least two of the criminal laws of Pennsylvania, <u>see</u> 18 Pa. C.S.A. § 5510; 35 P.S. § 1095, and the case would therefore be excluded by the Morticians' endorsement's criminal act exclusion.  Therefore, Nationwide does not have a duty to defend the McCafferty Funeral Home from any of the claims outstanding in <u>Laberta</u>.

**VI.     Margaret McCafferty's Motion to Sever and Motion to Stay**

The next two motions before this Court are Margaret McCafferty's Motion to Sever and Motion to Stay.

**A.     Motion to Sever**

First, in her Motion to Sever, Margaret McCafferty d/b/a James A. McCafferty Funeral Home argues that there has been, and will be, significant confusion between James McCafferty, Jr., who is one of the Liberty Defendants, and James McCafferty, Sr., whose name is used for Margaret McCafferty's Funeral Home.  Margaret McCafferty notes that the James McCafferty Funeral Home was never a defendant in the criminal proceedings that arose from the alleged scheme, and James McCafferty, Jr. was only involved in the scheme as a result of his ownership in Liberty, not as a result of his employment with the McCafferty Funeral Home.  Despite contrary allegations by the underlying complaints, Ms. McCafferty insists that James McCafferty, Jr. was never a shareholder, officer, or director of her funeral home.  In response, Nationwide argues that severing the case would waste time and resources with little benefit in eliminating any possible confusion.

Ms. McCafferty relies on Rule 21 in bringing her Motion to Sever.  Rule 21 of the Federal Rules of Civil Procedure provides that, "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party.  The court may also sever any claim against a party." Fed. R. Civ. P. 21.  "A district court has broad discretion in deciding whether to sever a party pursuant to [Rule] 21." Bradley v. Choicepoint Servs., Inc., 2007 WL 2844825, at *1 (E.D. Pa. Sept. 27, 2007) (Diamond, J.).  In considering a motion under Rule 21 for severance, courts have

traditionally considered whether the joinder of the parties is appropriate under Rule 20(a).[33]  See

Miller v. Hygrade Food Prods. Corp., 202 F.R.D. 142, 144 n.2 (E.D. Pa. 2001) ("While Rule 21

is silent as to the actual grounds for misjoinder, it is generally accepted that parties are deemed

misjoined when they fail to satisfy Rule 20(a).").  Rule 20(a) is meant to "promote trial

convenience and expedite the final determination of disputes, thereby preventing multiple law

suits."  Miller, 202 F.R.D. at 144 (quoting 7 Charles Alan Wright, Arthur R. Miller and Mary

Kay Kane, Federal Practice and Procedure § 1652 at 395 (3d ed. 2001)).

> Whether severance is warranted requires balancing of several
> considerations, including the convenience of the parties, avoidance
> of prejudice to either party, and promotion of the expeditious
> resolution of the litigation.  Specific factors are (1) whether the
> issues sought to be tried separately are significantly different from
> one another, (2) whether the separable issues require the testimony
> of different witnesses and different documentary proof, (3) whether
> the party opposing the severance will be prejudiced if it is granted,
> and (4) whether the party requesting the severance will be
> prejudiced if it is not granted.

Official Committee of Unsecured Creditors v. Shapiro, 190 F.R.D. 352, 355 (E.D. Pa. 2000)

(Reed, J.).

Though she did not rely on it in her Motion, Rule 42(b) also provides for the severance of

trials:  "For convenience, to avoid prejudice, or to expedite and economize, the court may order a

separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party

---

[33] Rule 20(a) of the Federal Rules of Civil Procedure provides that:  "Persons . . . may be
joined in one action as defendants if:  (A) any right to relief is asserted against them jointly,
severally, or in the alternative with respect to or arising out of the same transaction, occurrence,
or series of transactions or occurrences; and (B) any question of law or fact common to all
defendants will arise in the action."

claims." Fed. R. Civ. P. 42(b). "District Courts are afforded large discretion in deciding whether to sever claims for trial." <u>Miller</u>, 202 F.R.D. at 145.

Margaret McCafferty insists that she will be prejudiced if the claims concerning her son, James McCafferty, Jr., are not severed from those concerning the James McCafferty Funeral Home. But as Nationwide points out in its brief, a separate trial for the McCafferty Funeral Home would require much of the same evidence and the same witnesses as a trial for the other parties, including presentation of the insurance policies, evidence concerning the underlying scheme, what role the Liberty Defendants had in the scheme, and what role, if any, the McCafferty Funeral Home had in the scheme. Any benefit from severance through severance would be minimal, as Ms. McCafferty would still be required to remind the jury of the distinction between James McCafferty, Jr. and the James McCafferty Funeral Home and would still be required to present evidence of James McCafferty, Jr.'s limited role in the McCafferty Funeral Home. If this case does proceed before a jury, Margaret McCafferty will have a full opportunity to remind the jury of James McCafferty, Jr.'s role, of Margaret McCafferty's alleged lack of knowledge of the scheme, and of the jury's duty to independently consider what Margaret McCafferty's liability should be. Because any prejudice that may exist would be not be cured by granting the Motion, Margaret McCafferty's Motion to Sever will be denied.

**B.   Motion to Stay**

Next, in her Motion to Stay, Margaret McCafferty again argues that there is confusion between the James McCafferty Funeral Home and James McCafferty, Jr., one of the Liberty Defendants. She argues that, due to the confusion between the two, this litigation should be

stayed pending additional discovery in the underlying cases in order to clarify any confusion regarding the two.

This Court has since denied Margaret McCafferty's Motion to Stay in an Order dated September 1, 2009.  (08-3895, Doc. 103).  Discovery in this case will proceed as directed in that Order.

An appropriate Order follows.

O:\CIVIL 07-08\07-4767 Nationwide v. Garzone\07-4767, 08-3895 - Nationwide v. Garzone - Memo Re Summary Judgment.wpd